# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **LUCAS RODDY (#458846)** | **CIVIL ACTION** |
| **VERSUS** | |
| **BURL CAIN, WARDEN** | **NO. 10-0800-BAJ-RLB** |

**consolidated with:**

| | |
|---|---|
| **LUCAS RODDY (#458846)** | **CIVIL ACTION** |
| **VERSUS** | |
| **BURL CAIN, ET AL.** | **NO. 11-0730-BAJ-RLB** |

### <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law and recommendations therein. Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on February 25, 2015.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

LUCAS RODDY (#458846)                                       CIVIL ACTION

VERSUS

BURL CAIN, WARDEN                               NO. 10-0800-BAJ-RLB

consolidated with:

LUCAS RODDY (#458846)                                       CIVIL ACTION

VERSUS

BURL CAIN, ET AL.                                         NO. 11-0730-BAJ-RLB

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter comes before the Court on the petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This Court initially dismissed the petitioner's application upon a finding that the claims asserted therein were in part unexhausted and in part untimely. *See* R. Docs. 20 and 21. On appeal, the United States Court of Appeals for the Fifth Circuit granted a Certificate of Appealability and remanded the matter to this Court, directing the Court to re-visit the issue of timeliness. In accordance with that directive, this Court entered an Order (R. Doc. 29) directing the State to appear, in writing, and advise the Court, *inter alia*, whether it "contests the petitioner's assertion that his federal habeas corpus application in this Court [is] timely." *Id.* In response, the State of Louisiana filed an Amended and Supplemental Answer to the petitioner's habeas corpus application and acknowledged therein that the petitioner's claims are timely filed in this Court. *See* R. Doc. 30. Accordingly, this Court now concludes, as conceded by the State, that the petitioner's application is timely. In addition, inasmuch as the

petitioner has since exhausted his claim that was previously determined by the Court to be unexhausted (relative to an asserted wrongful failure to order DNA testing of certain evidence), that claim is also ripe for substantive review.

In the instant application, the petitioner challenges his 2002 conviction and life sentence entered in the Twenty-Third Judicial District for the Parish of Ascension, State of Louisiana, on one count of second degree murder.  The petitioner contends (1) that he was provided with ineffective assistance of counsel in several respects, (2) that his trial attorneys interfered with his right to testify at trial, (3) that the prosecution withheld evidence from the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), (4) that the cumulative effect of his attorneys' deficient conduct deprived him of a fair trial, and (5) that his constitutional rights were denied by the trial court's failure to grant his post-trial request for DNA testing of certain clothing discovered during the investigation of the offense.[1]  The State has filed a substantive opposition in response to the petitioner's claims.  There is no need for oral argument or for an evidentiary hearing.

## Procedural And Factual Background

The Court will not engage in a detailed recitation of the procedural history of this case, which history has been recounted at length in a prior Magistrate Judge's Report.  *See* R. Doc. 16. It is sufficient to note at this juncture that the petitioner's current claims were presented in his original and supplemental applications for post-conviction relief before the state district court, which applications were denied with written reasons on April 28, 2009, after an evidentiary

---

1.  The petitioner does not now assert in the instant proceeding certain claims that were presented before the state courts, specifically a claim regarding the alleged conflict of interest faced by his trial attorney – which claim was addressed and denied in connection with the direct appeal of his criminal conviction – or a claim regarding the alleged insufficiency of the evidence, which claim was asserted but withdrawn during state post-conviction review proceedings.

hearing conducted on March 19-20, 2009.  The petitioner thereafter sought supervisory review before the Louisiana appellate courts, and his applications were denied by those courts, without comment, on October 12, 2009, and November 5, 2010, respectively.  *See State ex rel. Roddy v. State*, 50 So.3d 818 (La. 2010).  Supplemental proceedings before the Louisiana appellate courts relative to the petitioner's request for DNA testing were also denied.  *State ex. rel. Roddy v. State*, 74 So.3d 725 (La. 2011), and *State ex rel. Roddy v. State*, 98 So.3d 825 (La. 2012).  The State concedes that the petitioner has exhausted state court remedies relative to the claims asserted herein and, as noted above, that the petitioner's application before this Court is timely-filed.

The evidence adduced at the petitioner's trial reflects that on September 15, 2001, the victim, Luke Villar, was an employee at DeLaune's Supermarket in Gonzales, Louisiana, and was sweeping the sidewalk and parking lot in front of the supermarket at around 5:30 a.m. when he was approached by two individuals.  These individuals were armed with guns later identified as being a 30-30 rifle with a scope and a .20 gauge shotgun.  The person armed with the 30-30 rifle shot the victim twice in the back and then walked into the store and fired through a counter where another employee, Angelina Weber, was attempting to hide.  Luke Villar was killed and Ms. Weber was wounded as a result of this encounter.

Three individuals were arrested the day following the offense, Justin Granier, Joshua Barrow, and the petitioner.  The ensuing investigation disclosed that Granier, Barrow and the petitioner had been together at two parties during the evening preceding the murder and that Granier and Barrow had been observed in possession of firearms that they had placed in the trunk of Barrow's girlfriend's vehicle.  Several witnesses testified that they observed Granier,

Barrow and the petitioner leaving the second party together in the referenced vehicle prior to the murder. A fourth participant in the events of the referenced evening, Nicholas Babin, was the owner of the shotgun allegedly utilized during the incident, had obtained and given the shotgun to Barrow during the evening at Granier's request, and had assisted in disposing of the firearms after the shooting.

All four of the above-referenced individuals were charged with offenses arising out of the events of September 15, 2011. Both Granier and the petitioner were charged with first degree murder, which charges were amended to second degree murder prior to their respective trials, and both individuals were convicted and sentenced to life imprisonment in connection with the amended charges. The third individual involved in the incident, Joshua Barrow, entered into a plea agreement prior to the petitioner's trial, pursuant to which he pleaded guilty to one count of attempted armed robbery and two counts of accessory after the fact to attempted first degree murder. Also prior to the petitioner's trial, the owner of the shotgun, Nicholas Babin, pleaded guilty to being an accessory after the fact to first degree murder. Both Joshua Barrow and Nicholas Babin testified against the petitioner at his trial.

Joshua Barrow testified at trial that he was at the two parties during the night preceding the murder and, at the request of Justin Granier, had gone with Nicholas Babin to Babin's residence to obtain a shotgun. Later on the same evening, sometime around 4:00 or 4:30 a.m., Joshua Barrow gave Justin Granier and the petitioner a ride to a friend's house. Upon leaving the friend's house, as they passed DeLaune's Supermarket, one of the passengers, believed to be the petitioner, yelled "stop the car," which Barrow did. Tr. R. at p. 1250. Granier and the petitioner then jumped out of the car, with the petitioner armed with a rifle and with Granier

armed with a shotgun.  *Id.*  As Barrow then waited in the vehicle, he heard some shots and, shortly thereafter, Granier and the petitioner returned to the vehicle.  According to Barrow, after the petitioner returned to the vehicle, he "dapped" fists with Barrow and Granier and made a statement, asserting "I really did it."  *Id.* at p. 1251-52.

Nicholas Babin testified at trial that he was at the same two parties with Granier, Barrow and the petitioner and, at some point during the evening, he went with Barrow and retrieved a shotgun that they placed in Barrow's vehicle.  Babin also testified that during the evening, he overheard Granier, Barrow and the petitioner talking about "hit[ting] a lick," which Babin understood to mean committing a robbery, and Babin understood that the shotgun was obtained for that purpose.  *Id.* at p. 1197.  After the incident, Babin asked Granier what had been done with the shotgun, and Granier responded that it had been hidden in some weeds outside of Babin's residence.  *Id.* at pp. 1205-06.  In addition, Granier advised Babin that the rifle was hidden under Babin's trailer.  *Id.* at pp. 1205-06.  Babin was later unable to find the shotgun – which police found in the weeds in front of Babin's residence – but he did find the rifle and threw it into a nearby bayou – which firearm police also later discovered and established to have been the murder weapon.  *Id.* at pp. 1211-12.

Testimony was also adduced from Charlene Potter, whose daughter was a friend of the petitioner.  According to Ms. Potter, the petitioner came to her trailer, with Granier and Babin, on the morning after the shooting, and stayed awhile, visiting with her daughter.  According to Ms. Potter, Granier and Babin left and returned again several times.  Charlene Potter testified that she then questioned the petitioner about "what was going on," and the petitioner responded that he had shot two people at DeLaune's Supermarket.  *Id.* at p. 1075.  Although Charlene

Potter initially provided a statement to police which denied any knowledge of the incident, she later provided a statement that implicated the petitioner and was consistent with her subsequent testimony at trial. She also testified that she questioned Nicholas Babin about the incident, and Babin admitted to knowledge regarding the disposition of the firearms after the shooting. *Id.* at p. 1077.

Several witnesses who had attended the parties on the night of the shooting were also called to testify, and their testimony was generally consistent to the effect that Granier, Barrow and the petitioner were together at the parties on the night of the shooting, that Granier and Barrow (but not the petitioner) were seen in possession of a rifle and/or shotgun, that Granier, Barrow and the petitioner left the second party (hosted by Justin Smith) sometime around 4:00 a.m., and that Granier and the petitioner returned to Justin Smith's house sometime after 6:00 a.m., after the occurrence of the shooting.

## Legal Discussion

The standard of review in this Court is that set forth in 28 U.S.C. § 2254(d). Under this statute, an application for a writ of habeas corpus shall not be granted with respect to any claim that a state court has adjudicated on the merits unless the adjudication has "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Relief is authorized if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Relief is also available if the state court identifies the correct legal principle but unreasonably applies that principle to the facts of the petitioner's case or reaches a decision based on an unreasonable factual determination. *See Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000). Mere error by the state court or mere disagreement on the part of this Court with the state court determination is not enough; the standard is one of objective reasonableness. *Id. See also Williams v. Taylor, supra*, 529 U.S. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable"). State court determinations of underlying factual issues are presumed correct, and the petitioner has the burden to rebut the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1399 (2011); *McCamey v. Epps*, 658 F.3d 491, 497 (5th Cir. 2011). Review under § 2254(d)(1) focuses on what a state court knew and did. *Cullen v. Pinholster, supra*, 131 S.Ct. at 1399. "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas corpus petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court." *Id.* at 1400. State court decisions are measured against the Supreme Court's precedents as of "the time the state court renders its decisions." *Lockyer v. Adrade*, 538 U.S. 63, 71-72 (2003).

### The Petitioner's Claim That He Was Provided With Ineffective Assistance Of Trial Counsel Is Without Merit

In the petitioner's first claim for relief, he asserts that he was provided with ineffective

assistance of counsel in several respects.  In this regard, a habeas petitioner who asserts that he was provided with ineffective assistance of counsel must affirmatively demonstrate (1) that his counsel's performance was "deficient," *i.e.*, that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced his defense, *i.e.*, that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial in which the result is reliable.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The petitioner must make both showings in order to obtain habeas relief based upon the alleged ineffective assistance of counsel.  *Id.*

To satisfy the deficiency prong of the *Strickland* standard, the petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards.  *See, e.g., Martin v. McCotter*, 796 F.2d 813, 816 (5th Cir. 1986).  The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence and that, under the circumstances, the challenged action might be considered sound trial strategy.  *See, e.g., Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988).  This Court, therefore, must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial.  *Martin v. McCotter, supra*, 796 F.2d at 817.  Great deference is given to counsel's exercise of professional judgment.  *Bridge v. Lynaugh, supra*, 838 F.2d at 773; *Martin v. McCotter, supra*, 796 F.2d at 816.

If the petitioner satisfies the first prong of the *Strickland* test, his petition nonetheless must affirmatively demonstrate prejudice resulting from the alleged errors.  *Earvin v. Lynaugh*, 860 F.2d 623, 627 (5th Cir. 1988).  To satisfy the prejudice prong of the *Strickland* test, it is not

sufficient for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding. *Strickland v. Washington, supra*, 466 U.S. at 693. Rather, the petitioner must show a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. *Martin v. McCotter, supra*, 796 F.2d at 816. The habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case; he must instead show a probability that the errors are "sufficient to undermine confidence in the outcome." *Id.* at 816-17. Both the *Strickland* standard for ineffective assistance of counsel and the standard for federal habeas review of state court decisions under 28 U.S.C. § 2254(d)(1) are highly deferential, and when the two apply in tandem, the review by federal courts is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

The above showing is one that the petitioner cannot make in the instant case.

**A. Failure to Investigate, Interview Potential Witnesses, or Call Witnesses to Testify**

In this claim, the petitioner asserts that his attorney failed to investigate or interview witnesses who allegedly would have provided evidence that the petitioner was not at DeLaune's Supermarket at the time of the shooting. Specifically, the petitioner asserts that his trial attorney relied solely upon statements obtained through police investigators and did not contact any of the witnesses identified by the petitioner. The only witness specifically addressed in the petitioner's brief before this Court, however, is a person named Michael Blair, who the petitioner asserts would have testified that the petitioner was with Blair at the time of the shooting.

The petitioner's argument is not persuasive. First, with regard to the petitioner's generalized assertion that his trial attorney did not interview any witnesses prior to trial and,

instead, relied only upon police investigation reports, this assertion is conclusory and is not

supported by the evidence in the record. In connection with the petitioner's post-conviction

relief application in state court, he was provided with an appointed attorney and was afforded an

opportunity at an evidentiary hearing to establish his claims in this regard. However, although

the petitioner's PCR attorney stated at the hearing that he had six (6) affidavits from witnesses

attesting that the petitioner's trial attorney never contacted the witnesses prior to trial, none of

these witnesses were called to testify at the hearing, notwithstanding that the court implicitly

recommended that the petitioner do so. *See* Transcript of PCR Hearing, March 19, 2009, p. 105

(wherein the trial judge stated, in connection with the purported affidavits, that presenting the

witnesses' testimony was "what I think we need to do"). In addition, the petitioner's PCR

attorney relied principally upon the testimony of the petitioner's trial attorney, Raymond

Gautreau, relative to this issue, who purportedly remembered little about the specifics of his

representation of the petitioner. The petitioner's PCR attorney notably did not call the

petitioner's co-counsel at trial or Gautreau's pre-trial investigator, either or both of whom, as

suggested by Gautreau, assisted in interviewing witnesses in advance of trial.[2] Further, although

Gautreau was conspicuously unhelpful at the PCR hearing – claiming almost a total lack of

recall relative to his representation of the petitioner – he did testify that in his usual practice, he

"would have spoken" with potential alibi witnesses in advance of trial, either personally or

through his investigator. *See id.* at pp. 103 and 133. Moreover, at an earlier evidentiary hearing

---

2. Although the petitioner's co-counsel at trial, Nick Nolting, had been appointed to assist with the death penalty aspect of the first degree murder charge, attorney Nolting nonetheless assisted with all aspects of the defense according to attorney Gautreau, and stayed and assisted at the trial after the indictment was amended to second degree murder. *See* Transcript of PCR Hearing, March 19, 2009, p. 124.

conducted in January, 2003, in connection with the petitioner's then-pending motion for new trial, attorney Gautreau's recollection was clearer, and he testified that the defense team had interviewed numerous witnesses prior to trial, including but not limited to Charlene Potter on several occasions, the occupant of a truck that had passed DeLaune's Supermarket at the time of the shooting (who testified that he had observed the perpetrators from a distance), several persons who had been at the parties attended by the petitioner on the night of the offense, a prison informant who testified at trial as a defense witness, and other witnesses who telephoned the attorney prior to trial after having received subpoenas to appear. *See* Tr. R. pp. 1371-78. Attorney Gautreau also testified that he attempted to speak with witnesses Justin Granier and Josh Barrow, but these witnesses were unwilling to cooperate. *Id.* at p. 1378. In addition, the parties concede that attorney Gautreau was provided with "open file" discovery from the State prior to trial and so had access to the entirety of the prosecution's investigative file. Thus, he testified at the hearing on the motion for new trial that whereas he did not interview *all* potential witnesses, because he had copies of their statements and could impeach them at trial in the event that they testified differently, he spoke with "a lot of witnesses" and "they confirmed what they did say in their statements." *Id.* These assertions by the petitioner's trial attorney are not clearly refuted by the record. Accordingly, the petitioner has failed to establish a substantive basis for his generalized claim that his trial attorney failed to investigate or interview witnesses prior to trial.[3]

_____

3. The Court further notes that, up until one week prior to trial, the sole witness anticipated by Gautreau to directly implicate the petitioner in the offense, as opposed to witnesses who were only expected to testify that the petitioner had attended the referenced parties on the night prior to the shooting and may have left prior to the offense, was Charlene Potter. It was only during the week prior to trial that it became apparent that Nicholas Babin and

11

Turning to the petitioner's *specific* claim that his trial attorney failed to interview or call Michael Blair as a witness, the petitioner asserts that Blair would have testified that the petitioner never left Justin Smith's party prior to the shooting and was in fact with Blair until after 6:00 a.m. the next morning and so could not have committed the offense. In support of this assertion, the petitioner attached to a supplemental motion for new trial in the state appellate court a transcript of a sworn interview given by Blair on August 15, 2003, almost a year after trial, wherein the witness made this representation. The petitioner further asserts, as described in the referenced transcript, that Blair provided this same information to police investigators during questioning conducted the day after the incident, but the investigating officer falsified the interview report to reflect that Blair informed the officer, in contrast, that the petitioner had left the party prior to the offense. According to the petitioner, his trial attorney should have interviewed Blair prior to trial and, with this information, should have called Blair as a defense witness at trial.

The petitioner's contentions with regard to Blair are unpersuasive. Whereas the petitioner would have the Court believe that the petitioner's trial attorney was unaware of the two competing versions of events provided by Blair, and so was unable to made a valid strategic determination not to call Blair as a witness, the record reflects that attorney Gautreau was in fact fully aware of Blair's potential testimony and chose, for strategic reasons, not to call Blair as a witness. Specifically, it appears from the record that the petitioner's mother advised the

---

Joshua Barrow had reached plea agreements with the state and would plan to testify against the petitioner at trial. Although attorney Gautreau then moved to continue the trial because of a stated need for further investigation in light of these developments, the trial court denied the requested continuance. *See* Tr. R. p. 439.

petitioner's trial attorney of the competing contradictory accounts provided by Blair, and attorney Gautreau concluded that Blair's testimony would not be found believable by a jury. In this regard, the petitioner's mother, Ruth Roddy, testified at the PCR hearing that she assisted attorney Gautreau prior to trial by conducting research and by speaking with witnesses. *See* Transcript of PCR Hearing, March 20, 2009, pp. 67 and 71-72. She testified that she spoke with Michael Blair prior to trial and subsequently informed attorney Gautreau that the witness would testify that the petitioner was with the witness at the time of the shooting, *see id.*, pp. 74-75 and 79, and that police investigators had prepared a falsified interview report that reflected otherwise, *see id.*, p. 82. Notwithstanding, it was not unreasonable for attorney Gautreau to conclude that there was no reasonable likelihood that the jury would believe Blair's unsupported assertion that the detective's summary of Blair's interview was a complete falsity when that summary was entirely consistent with the multitude of *unquestioned* statements provided by other witnesses present on the night of the shooting. Moreover, there were other reasons to question the veracity of Blair's proposed contradictory testimony, including his "extensive and active and ongoing criminal record," *see id.*, pp. 167-68, and his apparent willingness, at one point, to provide a *third* version of events, one that included the petitioner confessing to Blair an involvement in the offense, *see* Transcript of New Trial Hearing, January 24, 2003, Tr. R. at pp. 1518-19. As a result, the Court will not second-guess the strategic determination made by attorney Gautreau not to call Blair as a witness at trial.

Even accepting the petitioner's assertion that his trial attorney should have interviewed and called Michael Blair as a witness, the Court finds that the petitioner is unable to show that he suffered any prejudice as a result of this failure. The evidence was overwhelming at trial,

through the testimony of multiple party attendees, that the petitioner left the party in the company of Barrow and Granier prior to the shooting. In addition, the testimony of Joshua Barrow placed the petitioner at the scene of the shooting with a rifle in his hands, and both Charlene Potter and Joshua Barrow testified that the petitioner confessed to them his involvement in the offense, explicitly by confessing to Potter that he had shot the victim and implicitly to Barrow through his statement after the shooting that he "really did it." There is no reasonable likelihood that the contradictory testimony of Blair would have altered the conclusion of the jury that the petitioner had participated in the offense. Had Blair been called to testify at trial for the benefit of the petitioner, he would have been subjected to withering cross-examination based on his apparent prior contradictory statement to the investigating detective and on his apparently extensive criminal record. Thus, as reasonably found and as accurately recounted by the state trial court in denying the petitioner's post-conviction relief application relative to this claim:

> After a two day hearing in this matter, this Court finds that the petitioner provided no new evidence that would have been revealed with more investigation, save the proffered statement of Michael Blair. According to Roddy, Blair would have testified that he was with Roddy at the time of the murder and, therefore, he could not have been present during the shooting of Luke Villar. Roddy further provided evidence that he presented [attorney] Gautreau with this evidence and Gautreau informed the petitioner and his mother that the testimony would be unbelievable. This Court agrees with that assessment of Gautreau and finds the statement of Blair questionable and unbelievable at best.
>
> According to testimony of the Ascension Parish sheriff's office, this statement is in direct contradiction to the statement given by Blair during the immediate days following the murder.
>
> Multiple witnesses were called at trial of this matter who placed Roddy with Barrow and Granier, including:
>
> Justin Smith, who testified that at 4:45 a.m. he noticed that the petitioner, Barrow and Granier were no longer at the party, and further, that the petitioner and Granier returned to his house at 6:00 a.m.
>
> Carrie Falcon testified that she was also at the Smith party and saw Granier leave

the party at 4:30 or 5:00 a.m.  She testified that Granier returned to the Smith house at about 6:00 a.m. with the petitioner and got out of the car with a shotgun.

Trisha Trabeaux testified that she too was at the Smith party.  She saw the petitioner and Granier return to the Smith house at 6:00 a.m....

Amber Killian testified that she was at the Smith party.  At about 4:00 a.m., Killian testified that she saw Granier carry a gun from Smith's house and placed it in the vehicle, the petitioner and Barrow were already in the vehicle.  Once the gun was in the trunk, the three left the party together.

Jana Rossi testified that she lived about one and one-half (1½) miles from DeLaune's Supermarket and the petitioner, Barrow and Granier came to her house looking for her sister and her sister's boyfriend between 4:00 and 4:30 a.m.

In light of the overwhelming evidence that Roddy was at the Smith party until he left with Granier and Barrow between 4:00 and 4:30 a.m. and returned with Granier at 6:00 a.m., this Court finds the questionable testimony of Michael Blair would have made no difference in the outcome of the case, and the petitioner was not prejudiced.  This claim is without merit.

Reasons for Judgment on Application for Post Conviction Relief, pp. 7-8.

In addition to the foregoing, neither Blair nor the detective who took Blair's initial statement provided testimony at the PCR hearing.  Although Blair was subpoenaed to appear at the hearing and was present on the first day thereof, he did not honor the subpoena by attending the hearing the next day, and it does not appear that the petitioner's PCR attorney requested that the hearing be held open pending a bench warrant for Blair's attendance and testimony.  Thus, it does not appear that there was an adequate evidentiary basis for the petitioner's claim regarding the testimony of Michael Blair, and this Court finds that the above determination by the state court was not an unreasonable determination of the facts in light of the evidence adduced both at trial and at the evidentiary hearings conducted in connection with the petitioner's motion for new trial and application for post-conviction relief.  Accordingly, the petitioner has not established that he is entitled to relief in connection with this claim.

**B. Failure to Seek DNA testing of a Shirt Found in a Bar-B-Que Pit at Babin's Residence**

After the shooting, clothing that included a discarded black-and-white checkered shirt

was found in a barbeque pit located at the Babin residence.  The referenced shirt generally

matched a description given by witnesses of a shirt worn by one of the people observed at the

scene of the homicide, specifically the person who was apparently the shooter.  The petitioner

contends that it was deficient performance for his attorney not to seek DNA analysis of this shirt

to show that the petitioner was not the person wearing it at the time of the incident.  However,

the petitioner merely speculates regarding what such DNA testing may have revealed, and a

petitioner who alleges a failure to investigate on the part of counsel must be able to show with

specificity what the investigation would have revealed and how it would have altered the

outcome of the trial.  *Moawad  v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998).  A petitioner

cannot show prejudice with respect to a claim that counsel failed to investigate without adducing

what the investigation would have shown.  *Diaz v. Quarterman*, 239 Fed. Appx. 886, 890 (5th

Cir. 2007).  The petitioner cannot meet this test in this case.  Mere speculation regarding what a

DNA analysis may have shown is not sufficient to establish deficient performance on the part of

the petitioner's attorney.  *See Moawad v. Anderson, supra,* 143 F.3d at 948 (rejecting a claim of

alleged deficient performance for failure to test for "powder burns" where the petitioner "merely

asserts that there might have been powder burns"); *James v. Director, TDCJ-CID,* 2009 WL

484987, *3 (E.D. Tex. Feb. 26, 2009) (rejecting a petitioner's argument regarding the failure to

undertake testing as speculative).  Moreover, it is possible that the petitioner's trial attorney

made the reasonable strategic decision not to undertake DNA testing because such testing, had it

resulted in an identification of the petitioner's DNA, would in fact have incriminated the

petitioner as the person who committed the charged offense.  *See Moawad v. Anderson, supra*

(recognizing that the results of testing may have discredited the petitioner's defense); *Chandler*

*v. Marshall County Correctional Center*, 2010 WL 3717231, *4-5 (N. D. Miss. Sept. 14, 2010) (noting that testing may have resulted in evidence unfavorable to the petitioner).  Instead, the petitioner's attorney was able to argue in closing that the State's case was subject to attack because the State had failed to undertake DNA testing.  On the showing made, therefore, the petitioner's claim in this regard must fail.

Moreover, the absence of the petitioner's DNA on the shirt in question, had it been tested, would not likely have altered the jury's verdict.  As argued to the jury, under the Louisiana law of felony murder and the Louisiana law of principals, a criminal defendant may be found guilty of second degree murder when a person is killed during the defendant's active participation in a felony such as attempted armed robbery, regardless whether the defendant fired the shot that resulted in death.  *See* Tr. R. at pp. 1305-06.  *See also State v. Turner*, 138 So.3d 740, 747 (La. App. 5th Cir.), *writ denied*, 153 So.3d 438 (2014) (noting that "those persons who knowingly participate in the planning or execution of a crime are principals to that crime.... Whether a defendant actually fires the bullet that kills a victim is of no consequence, and the defendant may be convicted as a principal to the crime....  One need not possess specific intent to kill or inflict great bodily harm to be a principal to a second degree felony murder....  Rather, under the felony murder doctrine, the State need only prove the commission of the underlying felony or the attempt thereof").  Thus, inasmuch as there was overwhelming evidence that the petitioner was a participant with Joshua Barrow and Justin Granier in an attempted armed robbery during the early morning hours of September 15, 2001, during which the victim was shot and killed, it was not critical for the jury to find that the petitioner was the person who was wearing the referenced shirt and/or was the person who fired the fatal shots.

**C. Failure to Object to Amendment of The Indictment On the Morning of Trial**

The record reflects that on the morning of trial, prior to commencement, the State amended the indictment to charge the petitioner with second degree murder instead of first degree murder, and the petitioner was re-arraigned on the amended charge. Tr. R. at p. 454. No objection was made by the petitioner's attorney to this action. *See id.* at p. 455. The petitioner now contends, however, that the amendment changed the nature of the offense with which he was charged from a specific intent crime to a general intent crime and that his attorney should have objected because this was contrary to the grand jury's intent in indicting him for first degree murder.

The petitioner's claim is unfounded. Louisiana law allows for the amendment of an indictment or bill of information prior to trial, *see State v. Davis*, 385 So.2d 193, 196 (La. 1980), and that is what occurred in the instant case, reducing the charge from first degree murder to the lesser included offense of second degree murder. Such an amendment does not result in a violation of a petitioner's constitutional rights where the indictment has adequately placed him on notice of the offense charged against him so that he may prepare a defense. Thus, as stated in *Moliere v. Cain*, 2010 WL 5525012, *5 (E.D. La. Dec. 10, 2010), where an identical argument was presented and rejected:

> With regard to his claim that trial counsel was ineffective due to his failure to object to the late amendment to count one of the indictment, petitioner has clearly failed to satisfy the ... burden of proof. Counsel could not raise an objection because the amendment was not late, the charge having been amended prior to the commencement of trial. Further, petitioner was not prejudiced by such an amendment as it had the effect of subjecting him to the lesser charge of second degree murder rather than first degree murder. Thus, petitioner has failed to satisfy his burden of proof under *Strickland*.

*See also Dickerson v. Cain,* 2007 WL 433480, *6 (E.D. La. Feb. 5, 2007) (upholding a

determination that a habeas petitioner "could not show deficient performance or prejudice [where] .... the District Attorney amended the indictment to lower the charge from first degree murder to second degree murder"); *Bennett v. Cain*, 2011 WL 2690609, *7-8 (M.D. La. June 9, 2011) (rejecting a petitioner's claim that his constitutional rights were violated by the amendment of an indictment on the morning of trial from one count of first degree murder to one count each of second degree murder and armed robbery). Accordingly, this claim is without merit and should be rejected.

### The Petitioner's Claim That His Attorney Interfered With His Right To Testify By Providing Incorrect Legal Advice Is Without Merit

The petitioner next asserts that he wanted to testify at his criminal trial and that he repeatedly expressed this desire to his trial attorneys. At the evidentiary hearing on the petitioner's post-conviction relief application, he took the stand and attested to this assertion, and a proffer was made that his mother would have testified to the same effect. In addition, the petitioner testified at the referenced hearing (as his mother apparently would have) that his attorney advised him not to testify, and it appears that the petitioner ultimately accepted the attorney's recommendation. *See* Transcript of PCR Hearing, March 20, 2009, pp. 87-88. The petitioner now asserts, however, that the waiver of his right to testify was not freely and voluntarily given because the legal advice provided by his attorney was erroneous and based upon a faulty legal premise. Specifically, the petitioner asserts that the reason given by his attorney for recommending that the petitioner not testify was because it would have potentially exposed the petitioner to cross-examination regarding his extensive juvenile criminal record.[4]

---

4. At the PCR hearing, the petitioner's trial attorney conceded that he may have advised the petitioner (and the petitioner's mother) that at least one of the reasons for recommending

According to the petitioner, however, impeachment based upon the juvenile record would not have been allowed and, as a result, he asserts that his attorney's advice did not result in a free and voluntary waiver of his constitutional right.

A criminal defendant has a fundamental constitutional right to testify on his own behalf. *See Bower v. Quarterman*, 497 F.3d 459, 473 (5th Cir. 2007), *citing Rock v. Arkansas*, 483 U.S. 44, 50 (1997); *Harrison v. Thaler*, 2012 WL 1409269, *9 (N.D. Tex. April 23, 2012). This right is granted to the defendant personally and not to his counsel. *Bower v. Quarterman, supra.* The Fifth Circuit has recognized that a defendant may waive his right to testify and that defendants frequently do so on the advice of their attorneys. *Jordan v. Hargett*, 34 F.3d 310, 312 (5th Cir. 1994), *vacated on other grounds*, 53 F.3d 94 (5th Cir. 1995). Thus, there is no violation of the right to testify where the defendant merely acquiesces during trial in his attorney's recommendation that he not testify – even if the defendant decides later, in hindsight, that he should have testified. Instead, a violation of this right occurs only if the "final decision that [the defendant] would not testify was made against his will." *Id.* "A defendant who argues that his attorney prevented him from testifying must still satisfy the two prongs of *Strickland*." *Bower v. Quarterman, supra*, 497 F.3d at 473, *quoting United States v. Harris*, 408 F.3d 186, 192 (5th Cir. 2005). The Fifth Circuit "has repeatedly held there is a 'strong presumption that counsel's decision not to place [a defendant] on the stand was sound trial strategy.'" *Bower v. Quarterman*, *supra*, 497 F.3d at 473.

Based upon the petitioner's testimony at the PCR hearing, the Court finds, as did the state

---

against testifying was because of the potential damage that might result from cross-examination regarding the petitioner's juvenile criminal record. *See id.* at pp. 134-35 and 198.

trial court after the PCR hearing, that the petitioner's assertion that he was prevented from testifying by his trial attorney is conclusory and has not been established. Attorney Gautreau testified at the PCR hearing that he had no specific recollection regarding the petitioner's desire to testify but that, had the petitioner insisted on doing so, Gautreau's usual practice would have been to make a record before the trial court and to then allow the petitioner to testify notwithstanding a recommendation to the contrary. The petitioner effectively concedes that he was aware of his legal right to testify and, in light of his repeated references (while testifying at the PCR hearing) to the "advice" given by his attorney not to testify, *see* Transcript of PCR Hearing, March 20, 2009, pp. 87-88, it appears likely that he was not *prevented* from testifying by his attorney but, instead, ultimately acquiesced in his attorney's recommendation not to do so. Moreover, the petitioner did not assert at the PCR hearing that he was prevented from testifying, only that, after listening to his attorney's advice during trial, he "still *felt* as though [he] needed to take the stand." *See id.* (emphasis added). Thus, the Court finds no unreasonable determination by the state court in concluding that the petitioner has failed to show that he was prevented from testifying at trial.

Further, assuming that the petitioner's juvenile records were the only reason provided by his attorney for the recommendation not to testify, and even if this reasoning was flawed, this does not support a finding that habeas corpus relief is available in this case because the petitioner is unable to show that he was prejudiced by the alleged erroneous advice. As found in a case involving a similar contention by a petitioner, the Court concluded that:

> Based on the strength of the State's case against him, [the petitioner] undoubtedly would
> have faced rigorous cross-examination from the prosecutor about his actions .... In light
> of the evidence against him, [the petitioner] fails to show how his testimony would have
> made a difference in the outcome of the proceedings. *See Sayre v. Anderson*, 238 F.3d

631, 636 (5ᵗʰ Cir. 2001) ("Considering the overwhelming evidence of [defendant's] guilt, we cannot conceive of anything [defendant] could have said that would have provided any reasonable possibility of a different outcome"); *see also United States v. Mullins*, 315 F.3d 449, 456-57 (5ᵗʰ Cir. 2002) (holding that, even where a counsel's performance was found deficient for failing to honor his clients request to testify, there was no valid ineffective-assistance claim absent a showing of actual prejudice); *United States v. Willis*, 273 F.3d 592, 598-99 (5ᵗʰ Cir. 2002) (same).

*McMullin v. Thaler*, 2011 WL 3444209, *15 (S.D. Tex. Aug. 8, 2011). *See also Hammett v. Quarterman*, 2011 WL 1156110, *17 (S.D. Tex. Mar. 25, 2011) (concluding that, even if the petitioner's trial counsel's advice not to testify (because of prior convictions) was not sound, and even if the petitioner did not therefore knowingly waive his right to testify as a result, "petitioner cannot demonstrate that he was subsequently prejudiced").

In the instant case, the evidence was overwhelming against the petitioner. Evidence was presented that he spent the evening before the murder with Granier and Barrow, that they spoke that night about "hitting a lick" or committing a robbery, that they left together in a vehicle containing a rifle and shotgun a short time before the murders were committed, that the petitioner and Granier exited the vehicle at DeLaune's Supermarket carrying the referenced firearms, that the petitioner and Granier returned to the vehicle after shots were fired, at which time the petitioner reportedly stated "I really did it," and that the petitioner later admitted to Charlene Potter that he had shot two people at DeLaune's Supermarket. Based on this evidence, there is little likelihood that the petitioner's testimony would have made a difference in the outcome of the proceedings or would have created a reasonable possibility of a different outcome. Accordingly, the Court finds that the petitioner is unable to show that he was prejudiced by his attorney's alleged deficient performance in this respect, and this claim should be rejected as being without merit.

### The Petitioner's Claim That The State
### Withheld Exculpatory Evidence Is Without Merit

In his next assignment of error, the petitioner asserts that his constitutional rights were violated because the prosecution failed to disclose to the defense prior to trial, (1) the purported pretrial statement, discussed above, made by witness Michael Blair (and allegedly falsely transcribed by a detective), wherein the witness asserted that the petitioner had been with the witness at the time of the offense, and (2) a plea agreement allegedly made between the prosecution and Charlene Potter, pursuant to which the witness was offered leniency in connection with pending criminal charges in exchange for the witness' testimony against the petitioner.

The prosecution's suppression of material evidence favorable to the accused violates due process regardless of whether or not the prosecution acted in good faith or bad faith in failing to make a timely disclosure of the evidence. *Brady v. Maryland*, 373 U.S. 83-87 (1963). Evidence that is "favorable to the accused" includes evidence that tends directly to exculpate the accused as well as evidence that impeaches the testimony of a witness where the reliability or credibility of that witness may be determinative of guilt or innocence. *Giglio v. United States*, 405 U.S. 150, 154 (1972). The touchstone of materiality is a "reasonable probability" of a different result. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. As stated by the United States Court of Appeals for the Fifth Circuit:

> To establish a *Brady* claim, a habeas petition must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the petitioner, and (3) the evidence was material. In assessing the materiality of suppressed evidence, the Supreme

Court explained that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682. Recently, the Court further observed that a "reasonable probability" of a different result is shown when the non-disclosure "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the jury verdict. *Kyles v. Whitley*, [*supra*, 514 U.S. at 435].... Finally the materiality inquiry is applied to "the suppressed evidence collectively, not item-by-item." *Id.* at 436. Fifth Circuit decisions have expanded upon these statements, holding that "[t]he materiality of *Brady* evidence depends almost entirely on the value of the evidence relative to the other evidence mustered by the State." *Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1990), *judgment vacated on other grounds*, 503 U.S. 930 (1992).

*Spence v. Johnson*, 80 F.3d 989, 994-95 (5th Cir. 1996) (citations omitted). "The mere *possibility* that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976) (emphasis added). Moreover, "courts have been extremely reluctant to find a deprivation of due process when the prosecution has provided the defense with the necessary information and it can utilize the information, but decides, for tactical reasons, not to use such information." *United States v. O'Keefe, supra*, 128 F.3d at 894.

The petitioner points first to the purported statement made by Michael Blair to a detective the day after the shooting, during which Blair allegedly told the detective that the petitioner was with the witness at the time of the shooting and did not leave the party until after the shooting occurred. The Court finds, however, that the petitioner has failed in the first instance to establish that this statement was in fact made, and second, if so, that any prejudice resulted from the failure to disclose same because the record reflects that the petitioner's trial attorney was fully apprised of the substance of Blair's potentially beneficial testimony.

In a transcribed recorded interview between Blair and the petitioner's PCR attorney in

August, 2003, long after the trial, Blair represented that he had informed police officers the day after the shooting that the petitioner had been with Blair at the time of the offense and could not have committed the murder.  This information is clearly contradicted by an interview statement prepared by an investigating detective shortly after the shooting, which represents that Blair informed the detective that the petitioner had left the party prior to the shooting.  However, neither Blair nor the investigating detective provided testimony at the PCR hearing.  Thus, the petitioner has provided no credible evidence from any source that Blair in fact provided a statement inconsistent with the detective's interview statement or that the prosecution withheld such a statement from the defense.  Further, and more importantly, even if the prosecution failed to disclose an alleged initial exculpatory statement made by Blair, it is abundantly clear that the failure to disclose this statement, if such occurred, did not operate to prejudice the petitioner in any way.  To the contrary, the record reflects that the petitioner and his attorney were fully aware of *both* purported statements by Blair, *i.e.*, the one that the detective asserted that Blair provided and the contrary statement that the petitioner asserts that Blair provided.  Thus, the petitioner's mother testified at the PCR hearing as follows:

> Q:      You spoke to Mike Blair?
>
> A:      Yes.
>
> Q:      Mike Blair said ... that Lucas [Roddy] stayed at Justin Smith's house until after daybreak?
>
> A:      Yes.
>
> Q:      That's what he hold you?
>
> A:      Yes.
>
> Q:      That's what you went tell Mr. Gautreau?

A: Yes.

\* \* \* \*

Q: [Y]ou saw a police report from the police?

A: Yes.

\* \* \* \*

Q: Yes, and specifically Mike Blair had told the police that "at 2:00 hours on 9/15/01, he was at Justin Smith's house, where a party was taking place, he saw Justin Granier and Lucas Roddy at the party but didn't know where Justin Granier and Lucas [Roddy] left.... Michael [Blair] stated that early in morning after the sun was up, Justin Granier and Lucas [Roddy] came back to Justin Smith's acting normal," right?

A: That's what ... the police report was, which Mr. Gautreau went by.

Q: I know. "Michael [Blair] also advised that he didn't know what Lucas [Roddy] and Justin [Granier] had done, nor did he know where they had gone when they left Justin Smith's." ... Is that the statement that you saw from the police?

A: That's the statement that the police ... wrote down.

Q: Okay. Okay. And it was Mr. Gautreau's considered opinion that Mike Blair wouldn't be believed; is that right?

A: He believed the police report without investigating any further.

Q: Okay. But he did tell you, did he not, that he didn't think Mike Blair would be believed?

A: Yeah.

Transcript of PCR Hearing, March 20, 2009, pp. 79-81.

Based upon the foregoing, it is clear from the record that the petitioner's attorney was aware, prior to and during trial, of the alleged contradictory statements provided by Michael Blair, and the petitioner's attorney decided, in the exercise of his professional opinion, not to utilize the questionable testimony. Thus, there was no *Brady* evidence that was withheld from

the defense in this context because the defense was fully aware of the referenced evidence.

The petitioner also contends that a plea agreement was negotiated between the prosecution and witness Charlene Potter, pursuant to which Potter was offered leniency in connection with pending criminal charges if she testified against the petitioner at trial. The petitioner has failed to show that he is entitled to relief in connection with this claim. Ms. Potter testified at trial that no deal had been offered to in exchange for her testimony. And although the petitioner points to Ms. Potter's resulting lenient treatment to suggest an inference regarding such a deal, there is no direct evidence of same. To the contrary, the assistant district attorney who was prosecuting the pending criminal charges against Ms. Potter testified at the PCR hearing that no deal had been offered to Ms. Potter in exchange for her testimony. The trial court accepted this testimony and concluded that there was nothing suspicious in the determination by the state to *nolle prose* pending charges of (1) unauthorized use of a movable and criminal damage to property (considering that the evidence in support of those charges was allegedly weak) and (2) theft over $500.00 (considering that the evidence was allegedly weak, the complainant was Ms. Potter's employer, and the charge involved only a taking home of veterinary supplies from the employer's office). In addition, another intervening charge pending against Ms. Potter, of negotiating a stolen check in an amount less than $500.00, was handled through a pre-trial diversion program and resulted in restitution being paid. As found by the trial judge in rejecting the petitioner's contentions relative to this claim:

> While the petitioner attempted to infer that Potter must have been granted consideration for her testimony; there was no direct evidence of any deal presented.... Benjamin Johnson, Assistant District Attorney, testified that no bargain or deal was made with Potter for her testimony. He further described the felony charges for which she was facing charges. (1) The charge for unauthorized use of a movable and criminal damage to property was very weak and he did not feel that it was a case that could successfully be

prosecuted.  (2) The charge of felony theft over $500.00 was lacking in evidence and was a claim by her employer for stealing veterinary supplies – there was no direct evidence of the theft and there appeared to be no claim for restitution.  This claim was *nolle prossed* and this Court finds nothing suspicious about the state dismissing the prosecution.  The complainant was the employer of Potter, this Court finds it equally logical that Potter and her former employer resolved this matter outside of the criminal justice system.  (3) The third felony was for fraud and theft, by cashing a stolen check at Pecan Grove.  This theft was transferred to PTI program and restitution was made.  The Court finds nothing suspicious about this transfer ....  Without any clear evidence that consideration was given for her testimony, this Court does not find that the state was in violation of *Brady*.  Therefore, the Court finds this claim without merit.

Reasons for Judgment on Application for Post-Conviction Relief, pp. 11-12.

This Court finds no unreasonable determination of either the facts or the law in connection with the trial court's resolution of this issue.  According, considering the deference that is owed to the findings of the state trial court, the petitioner's claim in this regard should be rejected.

### The Petitioner's Claim Regarding Cumulative Error Is Without Merit

The petitioner next contends that cumulative errors in his case warrant a finding that his conviction is constitutionally deficient.  However, "[u]nder the cumulative error doctrine, relief may be obtained only when constitutional errors so fatally infect the trial that they violate the trial's fundamental fairness."  *United States v. Stephens*, 571 F.3d 401, 412 (5th Cir. 2009) (internal quotation marks omitted).  To provide relief, cumulative errors must have "more likely than not caused a suspect verdict."  *Carty v. Quarterman*, 345 Fed. Appx. 897, 909 (5th Cir. 2009), *citing Spence v. Johnson*, 80 F.3d 989, 1001 (5th Cir. 1996).  *See Maurer v. Dept't of Corr.*, 32 F.3d 1286, 1288-91 (8th Cir. 1994) (due process violated when prosecutor bolstered rape victim's testimony by asking four other witnesses whether she seemed sincere); *Cooper v. Sowders*, 837 F.2d 284, 286-88 (6th Cir. 1988) (due process violated by cumulative effect of trial

judge's incorrectly stating that police officer was an expert witness, allowing the officer to give opinion on defendant's guilt and allowing police informant to bolster credibility by discussing his testimony in prior cases); *Menzies v. Procunier*, 743 F.2d 281, 288-89 (5th Cir. 1984) (due process violated where numerous errors and prosecutorial misconduct "crippled the ability of the petitioner's attorney to present an effective defense on his behalf); *Walker v. Engle*, 703 F.2d 959, 963-69 (6th Cir. 1983) (due process violated by cumulative effect of six separate errors allowing admission of irrelevant and inflammatory evidence). When the Court finds no error of this magnitude, there can be no cumulative error. *United States v. Stevens, supra,* 571 F.3d at 412. In the instant case, the errors alleged by the petitioner to do not lead this Court to conclude that the verdict reached in this case is suspect or that the petitioner received a fundamentally unfair trial. Accordingly, the petitioner's contention relative to cumulative error should be rejected.

### The Petitioner's Claim Regarding
### The Trial Court's Failure To Order DNA Testing Is Without Merit

Finally, the petitioner asserts that the trial court violated his constitutional rights by failing to grant his post-trial request for DNA testing of the shirt found in the barbeque pit at Babin's residence after the shooting. In this regard, the trial court determined, in denying the petitioner's request for such testing, that:

> In post conviction proceedings, the Court should order DNA testing where testing would provide clear and convincing evidence that the Petitioner is factually innocent of the crime for which he was convicted. La. Code Crim P art 930.3(7). The DNA testing statute appears to be directed toward freeing the innocent, and not toward a reweighing of the evidence used to convict. Testing will be permitted only in those cases in which (1) a factual explanation of why there is articulable doubt as to guilt and, more importantly, that (2) DNA testing will "resolve the doubt and establish the actual innocence of the petitioner." *State v. Robertson*, ... 958 So.2d 787 [La. App. 2d Cir. 2007].
> During the trial of this matter, there was evidence presented by the State that

clothing found in the barbeque pit at Babin's home appeared to be similar to the clothing worn by the shooter. There was no clear, unequivocal evidence that the clothing found was actually worn by the perpetrator of the murder. Therefore, this Court found that DNA testing would not be evidence of actual innocence and testing was not warranted.

To the extent that the petitioner challenges the correctness of the state court's application of state rules governing DNA testing before this Court, it has been uniformly held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A federal court conducting habeas review is limited to determining whether a petitioner's custody is in violation of the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire, supra*, 502 U.S. at 68; *Engle v. Isaac*, 456 U.S. 107, 119 (1982). *See also Hansbro v. Cain*, 2006 WL 3488729, *7 (W.D. La. Oct. 20, 2006) (noting that the federal Court is not concerned with whether the state courts properly applied the state statutes relative to DNA testing). As a general rule, "[i]nfirmities in state habeas proceedings do not constitute grounds for federal habeas relief." *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004).

In addition to the foregoing, to the extent that the petitioner asserts that the Constitution demands that he be granted additional post-conviction DNA testing, such a claim has been foreclosed by the United States Supreme Court's decision in *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52 (2009). In that case, the Supreme Court determined that there is no free-standing federal constitutional right to obtain post-conviction access to the state's evidence for DNA testing. *Id.* at 72. Moreover, the petitioner cannot show in this case that the DNA testing that he requests would vindicate him or establish that he is innocent. As noted above, the state court determined that "[t]here was no clear, unequivocal evidence that the clothing found was actually worn by the perpetrator of the murder" and that, therefore, "DNA

testing would not be evidence of actual innocence." This was not an unreasonable determination of the facts in light of the evidence presented at trial. Thus, the presence or absence of DNA evidence on the shirt found later in the barbeque pit at Babin's residence, which shirt was not even established to have been worn by the shooter, would not result in a conclusive showing that the petitioner is innocent of the offense charged and would not likely have altered the jury's finding of guilt in this case. *See Williams v. Hines*, 2013 WL 5960673, *25 (E.D. La. Nov. 6, 2013) (rejecting a claim regarding DNA testing where the petitioner could not show that DNA testing "would vindicate him and establish that he is innocent"). Accordingly, this claim by the petitioner should also be rejected.

## Certificate Of Appealability

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although the Petitioner has not yet filed a Notice of Appeal herein, the Court may address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). A certificate of appealability may issue only if a habeas petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). In cases where the Court has rejected a petitioner's constitutional claims on substantive grounds, a petitioner must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005), *quoting Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In the instant case, the Court finds that reasonable jurists would not debate the denial of the Petitioner's

§ 2254 application or the correctness of the substantive ruling.  Accordingly, it is appropriate that, in the event that the Petitioner seeks to pursue an appeal in this case, a certificate of appealability be denied.

## **RECOMMENDATION**

It is recommended that the petitioner's application for habeas corpus relief be denied.

Signed in Baton Rouge, Louisiana, on February 25, 2015.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**